John W. Wolfe, *pro hac vice*
wolfe@orrick.com
Aaron P. Brecher, *pro hac vice*
abrecher@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, WA 98104-7097
Telephone:    +1 206 839 4300
Facsimile:    +1 206 839 4301

William H. Bittner
wbittner@bhb.com
BIRCH HORTON BITTNER & CHEROT PC
510 L Street, Suite 700
Anchorage, AK 99501
Telephone:    +1 907 276 1550
Facsimile:    +1 907 276 3680

Attorneys for Defendant Walter Earl

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>       Plaintiff,<br><br>   v.<br><br>**WALTER EARL,**<br><br>       Defendant. | Case No. 3:20-cr-00034-SLG-MMS<br><br>**MR. EARL'S SENTENCING MEMORANDUM** |

## I.  INTRODUCTION

In one week, Walter Earl will come before the Court for a combined change of plea and imposition of sentence. If the Court accepts Mr. Earl's plea of guilty to three counts of violating the Lacey Act and one count of tax evasion, it will proceed to sentencing.

Page 1   *United States v. Walter Earl*,
       3:30-cr-0034-SLG-MMS

Mr. Earl's crimes were serious and deserve punishment. He does not contest that. He unlawfully bought and sold walrus ivory head mounts. And he failed to pay his taxes for a long period. Despite the context he provides below, Mr. Earl has no excuse for these offenses and feels deep remorse for them. He hopes to make that clear to the Court in a brief statement at sentencing.

On the other side of the ledger, Mr. Earl is 76 years old. He has a criminal history score of zero. He needs shoulder surgery and physical therapy that he cannot secure in prison. The COVID-19 pandemic continues with new uncertainties surrounding the Delta variant, and elderly prisoners are among the most vulnerable to COVID. Mr. Earl has also shown extraordinary acceptance of responsibility: this has been a "plea-track" case from the start, Mr. Earl has already paid full restitution, and will swiftly pay the fines jointly recommended by the parties and the Probation Office. He will also comply with all provisions of the Marine Mammal Protection Act and discontinue the sale of illegal ivory. And unlike many similarly situated white-collar offenders, Mr. Earl does not ask the Court to impose a purely non-custodial sentence but seeks a term of probation conditioned on six months of home confinement. Case law confirms that home confinement—and indeed probation itself—constitutes a serious deprivation of liberty.

For these reasons, all the stakeholders—the government, Mr. Earl, and Probation—agree that incarceration is not warranted. Mr. Earl thus asks the Court to impose the parties' jointly recommended sentence.

## II. BACKGROUND & PROCEDURAL HISTORY

### A. Mr. Earl's Offense Conduct

The conduct for which Mr. Earl will plead guilty is explained in the Plea Agreement (Dkt. No. 2) and in the Revised Presentence Investigation Report ("PSR") (Dkt. No. 50). Mr. Earl therefore offers only a summary of that conduct.

*Lacey Act.* Mr. Earl owns the Antique Gallery in Anchorage. Though it accounts for only a tiny fraction of the store's revenue, buying and selling illegal walrus ivory was a part of

Mr. Earl's business. The counts to which Mr. Earl will plead guilty reflect several specific illegal transactions.

Each involved the illegal purchase and sale of a walrus ivory head mount. *See* Dkt. No. 2 at 5. Mr. Earl tried to conceal the illegality of the transactions, including by falsely claiming that two of the head mounts predated the Marine Mammal Protection Act. *See id.* But Mr. Earl knew that this claim was untrue. In each of the three instances, he knew that it was illegal for him to buy and sell the ivory. He has no excuse for this misconduct.

**Tax evasion.** Count 4 relates to Mr. Earl's failure to pay his federal income taxes from 2013 through 2017. *See id.* at 5–6. And indeed, his failure to pay taxes goes back much further. It also includes efforts to avoid his tax obligations—including structuring financial transactions in part to avoid reporting requirements and failing to file an individual income tax return, Form 1040. *See id.*

Part of the explanation—and Mr. Earl offers this background truly as explanation rather than excuse—for his failure stems from cognitive challenges Mr. Earl has faced throughout his life. One result of these challenges is that Mr. Earl has limited literacy. From the early years of operating the Antique Gallery, Mr. Earl worked with an accountant aware of his difficulty reading and familiar with Mr. Earl's unorthodox record-keeping. After his accountant's death, Mr. Earl worked with several others, but each ultimately proved unable to contend with his unusual recordkeeping. As time passed, Mr. Earl became embarrassed about both his failure to pay taxes and the thought of disclosing to yet another accountant that he has a limited ability to read. This shame contributed to a cycle that Mr. Earl could not break.

Since the Information, Mr. Earl has filed tax returns and paid full restitution—more than $216,000—to the government for the years identified in the Information and the Plea Agreement.

**Other conduct.** Though uncharged, Mr. Earl also admitted in the Plea Agreement to selling firearms without a required license in violation of 18 U.S.C. §§ 922(a)(1)(A) & 923(a)(1)(D). Mr. Earl has agreed to discontinue the sale of firearms (although he continues to sell antique weapons, which the federal government does not classify as "firearms").

***Procedural history.*** Following the parties' negotiation of an agreed plea, the government filed the Information and Plea Agreement in April 2020. *See* Dkt. Nos. 1 & 2. At an initial appearance before Judge Scoble the next month, Mr. Earl waived his right to an indictment and was allowed to remain free on his own recognizance pending a change of plea and imposition of sentence. *See* Dkt. Nos. 12 & 13. Mr. Earl has complied with all conditions of his release even as the parties—with the Court's blessing—have agreed to delay these proceedings because of the pandemic and other scheduling issues.

**B.     Mr. Earl's Personal Characteristics**

Mr. Earl—a man of humble roots—is a loving husband to Patricia, his wife of 54 years. Born to working class parents in Michigan, Mr. Earl's childhood was marked by frequent moves and occasional food insecurity.

His family life was not always happy. Mr. Earl's father was emotionally abusive toward Mr. Earl and his sisters and physically abusive toward Mr. Earl's mother. Mr. Earl also suffered from cognitive challenges—which continue to plague him—inhibiting his ability to read and write. To this day, Mr. Earl faces substantial difficulty reading. This led to him being held back at least a year in school, until eventually teachers passed him on without addressing his limited literacy. To stave off physical discipline from his father, Mr. Earl's mother used to hide his report cards reflecting those difficulties.

Despite these challenges, Mr. Earl proved himself industrious and hardworking even at a young age. He used to sell tomatoes door-to-door. To that enterprise he added selling antiques when he was just 9 years old. Mr. Earl started working at a young age at a local auction house, sweeping floors and cleaning the items to be auctioned. His work selling antiques continued throughout high school, which he graduated despite his severe challenges with literacy.

Two years after finishing high school, Mr. Earl proudly served his country by enlisting in the U.S. Army. He received an honorable discharge three years later. That service brought him to his adopted home in the State of Alaska, where he was stationed at Fort Wainwright. Mr. Earl and his wife moved from Fairbanks to Anchorage in 1973, remaining ever since.

Mr. Earl's move to Alaska started an almost-twenty-year career with the Alaska Railroad, which included time credited with his military service. Despite his difficulties in reading and writing, Mr. Earl relied on a talent for numbers and math and his prodigious memory to keep timecards and pay records. In 1991, he retired from the Alaska Railroad with a full pension after a successful tenure.

Several years before that retirement, Mr. Earl planted the seed for what would become the Antique Gallery. He leased a stall in an antique mall in the late 1980s, from which he began selling. As a testament to his indefatigable work ethic, he often worked from 6:30 p.m. until midnight after working a full day at the Railroad.

In 1991, Mr. Earl opened the Antique Gallery at its current location in downtown Anchorage. The store's revenue comes mainly from estate jewelry, rare coins, china, fine art, and glassware, rare books and prints, 18th-century weapons, and native art. Less than two percent relates to the sale of ivory. Visitors to the Antique Gallery marvel at the lack of price tags—Mr. Earl knows at what price he is willing to part with each of the thousands of items in the store. His incredible memory partly stems from necessity: Mr. Earl's struggles with literacy have made traditional record-keeping impracticable. His prior method involved large hard-copy books with transactions recorded in a distinctive shorthand that Mr. Earl can understand. Since the government's investigation, Mr. Earl has hired a professional bookkeeper to track purchases and sales electronically, and now works with professional accountants and tax attorneys.

Mr. Earl's criminal conduct, while unacceptable, does not reflect the full measure of this hardworking salt-of-the-earth individual and devoted husband of more than five decades.

## C. The Sentencing Guidelines Range

The parties agree on the correct Guidelines calculation for Mr. Earl. Closely related counts of conviction fall into a group under U.S.S.G. §§ 3D1.1 & 3D1.2. The three Lacey Act counts should be grouped together under U.S.S.G. § 3D1.2(d), with their offense level determined by U.S.S.G. § 2Q2.1. Count 4 (tax evasion) is governed by U.S.S.G. § 2T1.1. The

higher of the two offense levels for these groups applies as the total offense level for the combined groups. *See* U.S.S.G. § 3D1.2(c).

Here, it is the tax evasion count that leads to the higher offense level. Under the tax table and corresponding tax loss ($216,054) in U.S.S.G. §§ 2T4.1 & 2T2.1.1(a)(1), the base offense level is 16. To that, it is appropriate to add two points because Mr. Earl failed to report or correctly identify the source of income exceeding $10,000 in any year from criminal activity. *See* U.S.S.G. § 2T2.1.1(b)(1). But Mr. Earl has a right to a 3-point reduction in his offense level because of his acceptance of responsibility. U.S.S.G. § 3E1.1(a)–(b). This leads to a total offense level of 15.

Mr. Earl's criminal history score of zero puts him in Category I. Together with his offense level, this leads to a Guidelines range of 18 to 24 months. But critically, the government and the Probation Office agree with Mr. Earl that the facts justify a downward variance and that a Guidelines sentence is not reasonable. *See* Local Criminal Rule 32.1(e)(4)(B).

### III.     DEFENSE PROPOSAL & DISCUSSION

If the Court accepts Mr. Earl's plea, he asks the Court to consider and impose a sentence requiring:

- 3 years of probation conditioned on:
    - 6 months of home detention with work release provisions allowing Mr. Earl to keep operating his store
    - Paying his agreed recommended wildlife criminal fines and half of his tax-related criminal fines (Dkt. No. 2 at 14) within two days of sentencing, with the balance of the tax-related fines paid within 6 months of sentencing
    - 200 hours of community service
    - Mr. Earl's consent to a search of his business at any time
    - Mr. Earl's avoiding future crimes, including by remaining current on his tax filings and payments

- - o Mr. Earl's ceasing further sales of non-antique firearms (firearms manufactured after 1898) and illegal marine mammal artifacts
  - Early termination of probation if Mr. Earl's store is closed or sold to an independent third party—subject to completion of Mr. Earl's home detention, and community service and to full payment of all criminal fines

As the Court knows, a sentence should be "sufficient, but not greater than necessary, to comply with the purposes" in 18 U.S.C. § 3553(a). *Pepper v. United States*, 562 U.S. 476, 491 (2011) (quoting 18 U.S.C. § 3553(a)). Sentencing courts "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensure." *Gall v. United States*, 552 U.S. 38, 52 (2007) (citation omitted). While courts must consider the Sentencing Guidelines as part of this individualized assessment, the Guidelines are neither determinative nor presumptively appropriate. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The § 3553(a) factors include the nature and circumstances of both the offense and the offender and other considerations like deterrence, just punishment, public safety, and the interest in paying restitution to victims.

This memorandum will not march through a formulaic discussion of those factors. Instead, they are subsumed in the discussion of the circumstances that favor Mr. Earl's proposed sentence. These include Mr. Earl's extraordinary acceptance of responsibility, the meaningful punishment and deterrence effect that six months of home confinement entail, Mr. Earl's age and health—alongside the uncertainty posed by our continuing battle with the COVID-19 pandemic—and the agreement of all stakeholders on an appropriate outcome.

A. **Mr. Earl's Extraordinary Acceptance of Responsibility**

Mr. Earl's conduct was inexcusable. He knows that. And he will not tell the Court anything different either here or at his sentencing hearing. That is why he will plead guilty next week and hopes that the Court will accept his plea. His remorse is also why—as the government will confirm—this matter has been on a plea track since Mr. Earl engaged his current criminal

defense counsel. Beyond his plea itself, Mr. Earl has also directed the preparation of a written statement accepting responsibility for his actions. *See* Ex. 1. And he wishes to address the Court orally during sentencing to offer a heartfelt apology for his wrongdoing. As the Court knows from this memorandum and from the PSR, Mr. Earl has trouble reading. As a result, he cannot rely on written notes for his oral statement, and it will be correspondingly brief.

Mr. Earl has also proved his commitment to accepting responsibility for his crimes and mending his ways by paying full restitution—more than $216,000 in tax liability—before entering his plea. *See* Ex. 2. That action, together with his commitment to swiftly pay criminal fines that many defendants let languish for years, highlights Mr. Earl's understanding that he has done wrong. His first step after admitting that wrong has been to make his victim—here, the United States—whole.

These actions show that even before the Court has imposed any sentence, the gravity of these proceedings has promoted Mr. Earl's respect for the law. And the weighty restitution and fines he has paid also constitute punishment. *See* 18 U.S.C. § 3553(a).

**B.      Home Confinement Entails Serious Punishment and Deterrence**

Perhaps nothing underscores Mr. Earl's acceptance of responsibility more than the sentence he asks the Court to impose. Many white-collar offenders with no history of violence or hint of danger to public safety ask for sentences involving no detention of any kind. Mr. Earl does not think that proper here. So he asks the Court to condition his probation on six months of home confinement, with suitable work release allowances enabling him to keep operating his business.

And home confinement is real punishment for Mr. Earl's crimes. Indeed, there is a "substantial restriction of freedom" involved in any term of supervised release or probation, even without a home detention requirement. *Gall*, 552 U.S. at 48 (quotation omitted). While incarceration is more severe than non-custodial sentences, even the latter substantially curtail liberty. *See, e.g.*, *United States v. Ruff*, 535 F.3d 999, 1004 (9th Cir. 2008); *United States v. Munoz-Nava*, 524 F.3d 1137, 1149 (10th Cir. 2008) (holding that "home confinement and

supervised release substantially restrict the liberty of a defendant"); *United States v. Gonzalez*, 2004 WL 230992, at *6 (S.D.N.Y. Feb. 5, 2004) ("Imposing a period of home detention rather than incarceration [on a defendant who had never been incarcerated] will adequately serve the aims of punishment and deterrence.").

If sentenced to home confinement, Mr. Earl would thus pay a meaningful price for his wrongdoing. Such a sentence would also deter others. "[T]here is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (collecting authorities). Especially here, where the government and Probation agree that imprisonment is unnecessary, nothing supports a harsher sentence. And of course, incarceration would threaten Mr. Earl's ability to pay his criminal fines because it would shutter his business.

As for specific deterrence, Probation agrees that Mr. Earl's lack of history of violence and substance abuse minimizes any danger to the public in the future. And the substantial restitution already paid, plus the agreed recommended fines in the plea agreement will deter him from future unlawful behavior. *See* PSR at 2. Given his age, and as the U.S. Sentencing Commission's own findings bear out, Mr. Earl is unlikely to reoffend.[1]

**C.     Mr. Earl's Age and Health**

This decreased chance of recidivism is not the only reason Mr. Earl's advanced age and health weigh against imprisonment. Prison would be correspondingly harder for someone in Mr. Earl's condition, and the costs of his healthcare passed on to the public. The lingering effects of the coronavirus pandemic—with the unknown trajectory of the Delta variant and other possible developments—also favor probation conditioned on home confinement.

First, Mr. Earl has substantial health issues to grapple with. He had surgeries this past April to remove a cancerous growth on his leg and to repair a wrist injury he suffered during a

---

[1] *See* U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 3, 18, 26 (Dec. 2017) (finding that recidivism declines with age at all sentence lengths, including offenders sentenced to probation and those sentenced to probation and community confinement). This study is attached for the Court's convenience as Exhibit 3.

fall. Mr. Earl also has mobility and ligament ailments that will require shoulder surgery. His follow-up care will include physical therapy that he understands would not be available to him if in the custody of the Bureau of Prisons. A sentence of probation conditioned on home confinement both reflects compassion for these conditions and allows the public to avoid paying for what may prove to be expensive medical care.

Second, "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided." *United States v Garlock*, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (continuing surrender date). While conditions are not as they were a year ago, new uncertainties over the Delta variant impose new risks. *See* Ex. 4. And no group is more vulnerable to these risks than elderly prisoners. *See, e.g.*, Ex. 5; *see also* Tana Ganeva, *Prisoners & the Pandemic*, ROLLING STONE (May 18, 2021), https://www.rollingstone.com/covids-most-vulnerable-population-elderly-prisoners/. At 76, Mr. Earl would fall within that group. Sentencing him to prison after his extraordinary acceptance of responsibility and in the face of alternatives that better serve the § 3553(a) factors would be unjust.

Contrary to Probation's suggestion that Mr. Earl be subject to electronic monitoring, no such monitoring is necessary. First, Mr. Earl has strong ties to the Anchorage community and a successful business to run. Those ties and his age make any electronic monitoring superfluous. Second, no surer metric of Mr. Earl's likely conduct on probation exists than his complete compliance with the terms of his pretrial release for more than a year.[2]

---

[2] This issue is the only substantive dispute that Mr. Earl has with the PSR. *See* Local Criminal Rule 32.1(e)(4)(A).

### D. The Parties' Agreed Recommendation

Unusually, all the stakeholders agree that the right result here is home confinement for six months, along with the other conditions discussed above. That consensus itself justifies a substantial downward variance from the Guidelines range.

The government must vindicate the public interest. It is also the victim here, given Mr. Earl's tax evasion. It is telling, then, that the government recommends probation conditioned on six months of home confinement and community service, just as Mr. Earl does.

Perhaps even more persuasive are the views of the Probation Office—a trusted arm of the Court with deep experience in recommending and assessing punishments for federal offenses. Probation likewise counsels that home confinement, fines, and community service are a better fit for Mr. Earl's conduct than prison.

While the Court has discretion to impose the sentence it considers appropriate, the atypical convergence of recommendations here strongly supports a probationary sentence conditioned on home confinement.[3]

### IV. CONCLUSION

For these reasons, Mr. Earl asks the Court to impose a sentence of probation conditioned on 6 months of home confinement, 200 hours of community service, and the payment of fines recommended in the Plea Agreement.

---

[3] Finally, because Mr. Earl's particular combination of failing to pay income tax and selling wildlife in violation of the Lacey Act alongside his medical issues and the effect of the pandemic is distinctive, following Mr. Earl's recommendation would create no disparities—much less unwarranted ones—from sentences imposed in similar cases. *See* 18 U.S.C. § 3553(a).

Dated: August 4, 2021					ORRICK, HERRINGTON & SUTCLIFFE LLP


						*s/John W. Wolfe*
						John W. Wolfe, *pro hac vice*
						wolfe@orrick.com
						Aaron P. Brecher, *pro hac vice*
						abrecher@orrick.com
						Telephone:	+1 206 839 4300
						Facsimile:	+1 206 839 4301


						BIRCH HORTON BITTNER & CHEROT PC


						*s/William H. Bittner*
						William H. Bittner, Alaska Bar No. 7210042
						wbittner@bhb.com
						Telephone:	+1 907 276 1550
						Facsimile:	+1 907 276 3680

						Attorneys for Defendant Walter Earl

The undersigned hereby certifies that on the 4th day of August, 2021, the foregoing was served on the following via the Court's CM/ECF electronic delivery system:

Steven Skrocki
United States Department of Justice

A copy of the foregoing will also be served through email on the Probation Office under Local Criminal Rule 32.1(e)(1).

Dated: August 4, 2021                                    ORRICK, HERRINGTON & SUTCLIFFE LLP


                                                        *s/John W. Wolfe*
                                                        John W. Wolfe